Final case for the day, we'll hear will be the United States v. Jennings and we'll hear from Defenders Counselor. Thank you, your honors. May it please the court. I'm Anne Hayes. I represent the appellant Raymond Jennings in this action. I plan this morning to focus my argument on the speedy trial claim that's presented in argument one of my brief. Of course, if the court has questions about other issues, I'd be happy to address those. There's no dispute on appeal that Mr. Jennings was entitled to dismissal of his first case due to a speedy trial violation. The district court erred, however, when it dismissed the first case without prejudice rather than with prejudice. The district court's decision rested largely on two clear errors of fact. That's Judge Osteen's decision. That's correct, your honor. And it's important to note that Judge Osteen made his decision based on things that happened in a courtroom over which Judge Biggs was presiding and where she made findings that were inconsistent with the findings that Judge Osteen later relied on. Just about got everybody in the middle district, didn't you? Just about. Just about, your honor. In fact, a third judge presided after the ultimate trial. Okay, but just to tee up the issues then, since you brought that up, we have cases about when and under what circumstances the district court can reconsider its own previous findings or order and in particular how that's impacted if it goes from Judge 1 to Judge 2. I don't understand any of your argument to depend on that. I mean, I know it may be atmospherically helpful for you, but that's not the argument you're making, right? That Judge 2 committed some sort of procedural error by disagreeing with Judge 1. I think it's an absolute substantive error, your honor. No, but I'm just saying there are cases about the limitations of a court's ability to do that, and I don't recall your brief making any argument that that's the problem. I didn't make that argument that that was the problem, but what the problem is, is that, and this is a chicken and egg situation in terms of which mistake came first or which mattered first, but as far as the mistakes that I'm talking about that Judge Biggs remarked upon, Mr. Jennings had some concerns about defects, a defect in the original indictment. Now, legally, lawyers at this point can sit back and say that didn't affect the case, it shouldn't have been important, yet. It was sloppy at best, I mean, at least. I mean, how do you add in heroin when heroin's not even on the table? Correct, your honor. And then how do you stir up the indictment a second time after you've already stirred up the indictment once? Because you can't get the schedule right. I mean, cut and paste should have precluded that. Nevertheless, Judge Biggs was in the courtroom when she addressed Mr. Jennings about his concern about the indictment defect. She was able to observe him, to look at him, discern whether he was sincere in his beliefs, whether he was truly concerned or whether he was trying to manipulate something, and if the court will indulge me, I would like to read to you some of the comments that Judge Biggs made. I'm not sure that Judge Osteen read the transcript that contained it.  You read them, okay. So, it's really troubling, it's a mess, I can't understand how it happened. If I were him, I'd be very upset. If I were him, I'd look at it and I'd have some real serious issues about the people who are running this prosecution. So, not only did she find at that point that Mr. Jennings was reasonable in having concern about the indictment defect, but she absolutely validated his concerns. And after a judge tells you what you've done is absolutely reasonable, if you act on that, that is inherently reasonable. And Mr. Jennings acted on that in this case by discharging his lawyer the next day because it can be inferred from the record that his lawyer had told him that it wasn't a big deal, that there was a defect in the indictment. And again, we can reach that conclusion as lawyers, but Judge Biggs knew who was in front of her. She knew that he was the only person in the room who wasn't a lawyer, who didn't understand this, understood that Mr. Jennings is a person for whom mistakes have consequences, huge consequences. When Mr. Jennings makes a mistake, he goes to prison for 20 years, he doesn't get any do-overs. So, of course, he was baffled when he was in the district court and the prosecutor had made this mistake that even back at the time of the initial appearance, the magistrate judge pointed it out to the prosecutor and said, this might be something you need to supersede or correct the indictment on. And so, it's absolutely reasonable that Mr. Biggs... Yes, that was absolutely true. When I say he went to prison for 20 years, it's like he went to prison for 20 years on a mistake. No, no, no. I'm not referring... The mistake was corrected. The problem here is the length of time and the speed of trial act. I mean, whether he ultimately went to prison for something he did, I mean, he kind of did. I mean, because he went to trial, he had a clean, nice, clean indictment by the time they actually tried it. The jury found guilty, the judge sentenced him. Yes, Your Honor, let me clarify. I don't mean that he went to prison on the mistake of the government. The mistake you're saying is the mistake is possession with an intent to distribute... His criminal conduct. His criminal conduct. And from his perspective, that's a pretty serious mistake that he made in his life. So, in any event, not only did the judge make that mistake as a clear error of fact, Judge Osteen... What was the clear error of fact that Judge Osteen made? I'm totally tracking how upset Judge Osteen was about this. Judge Osteen later said that Mr. Jennings was unreasonable in being concerned about this matter and that it led to frivolous conduct on his part in discharging his lawyer. Lawyers, right? Well, he did discharge more than one lawyer, but the only material discharge of a lawyer in this case that impacts the speedy trial calendar was the first discharge of the lawyer. Because by the time of the later discharges, we'd already run? Exactly. I thought he was Judge Osteen. I'm sorry, I'm sorry. Go ahead and clear the question. I'm sorry. The second lawyer was appointed... Let me look at my timeline. There's so many lawyers, Your Honor. It seems to me that the second lawyer was appointed on March 4th. Is that right? That's correct. And that's when the 60-day critical period of delay commenced. When he was represented by Lawyer 2. When he was represented by Lawyer 2. Where does Judge Osteen say he was unreasonable in being upset about the indictment? I'm totally not getting that. I have that his objections end up being largely irrelevant and ultimately resulted in large part to a frivolous delay of these proceedings. I can't quite track that, but... Well, I'll point to the court to page 147 in the appendix where he said... At this point, he talks about counsel, Mr. Jennings being without counsel at various times. He says, any breakdown in communication with counsel didn't result from the government's errors but instead resulted from defendants' frivolous responses to those errors. This would include, like, telling your lawyer to stop harassing me when they want to talk to you about legal proceedings and then you say, stop. I mean, at some point he does that and says they're bad. What is the thing the Gen Zs would say? Stop bullying me by coming to talk to me about my case, right? Your Honor, where that happened was Mr. Jennings believed that after the hearing with Judge Biggs that Judge Biggs had discharged her lawyer at that point. That's what he reflects in his motion. And then that lawyer came to see him two more times, and so that was confusing and felt like harassment to him. But to be clear on Judge Harris's question... Yes. It seems Judge Osteen was talking about his conduct with his lawyers, not the indictment. Well, he talks about the defendant's unreasonable and unfounded positions contributing to the necessity for substituting counsel. And so one thing led to another. Ultimately, the judge relied on the fact that he discharged counsel as being unnecessary and that set other things in motion. I mean, it's a fairly long oral opinion. Yes. I really sort of thought the thrust of it was he says, look, there were a lot of mistakes here, including the government, and that what he really felt was contributing to the confusion around this two-month period is that there's this executed plea agreement out there, and the defendant is, perhaps because he is in between lawyers, doesn't make his intentions clear. Does he actually want to go to trial? Is he going with the plea agreement? But I didn't really, at least what I kind of think of as, like, here's where I'm explaining what went wrong here. I'm not getting quite so much of a flavor of, man, this guy with his, like, frivolous responses to government errors. I mean, I hear what you're saying, and it's wrong. There's a lot of discussion. There's a lot. And, in fact, at one point, the judge says to Mr. Jennings, or says to everybody in general in the courtroom, you know, if his lawyers try to explain something to him and he doesn't take that to heart, it's on him. But it's not on him. Judge Biggs found it wasn't on him, that he legitimately misunderstood. If I might talk about the second clear error effect, Your Honor, and that happened where the judge accurately identified the two-month period between March and May as being a critical period of delay. And, interestingly enough, it said that it wasn't going to take the government's word that that resulted only from inadvertence, but it was going to look at the general case and find that out. And so it came up with a theory where the things that Judge Harris, that you mentioned, might have contributed to some confusion or some delay. The problem with that finding, Your Honors, is that the government never claimed that. They filed a written position on their speedy trial issue. Their primary argument was that they didn't think there was a violation, that the excludable time didn't exceed. The non-excludable time was far less than 70 days. But when it got to, it said, well, but, you know, if you do find there was a violation, the circumstances don't support a dismissal with prejudice. And then they ran through linearly sort of what happened in the case, and it got to the point about the 60 days and said, you know, we indicted him, but we didn't get him arraigned until more than 60 days later, and that's on us. We're responsible for that. And so they weren't looking to an excuse to say we were confused or something else. And, indeed, the record shows, and so that's something where it looks to me that Judge Osteen went back and filled in some gaps and made an excuse on behalf of the government. Now, previously in the... Well, Judge Osteen also said it was partly the court clerk's problem, right? The judge basically was like, we are here today because all three legs of the stool screwed up. The defendant was like, the stuff about the defendant, the government didn't proactively act, and the court's clerk also sort of dropped the ball. But, Your Honor, the defendant didn't screw up. People gave him some bets. The judge vindicated his position. He didn't screw up. It is pretty clear. There was a signed plea agreement. There was. And there was, like, just hanging out there for a while, and he didn't communicate to the court that he wanted out of his plea agreement. That is on him. Now, maybe it's on him because of a misunderstanding between him and his agent, his lawyer, but, like, from the court's perspective, the defendant never said, I want out of my plea agreement. Nevertheless, around the same time, the indictment was... That's true, right? That's true. There was a period of time where the defendant never said, I want out of my plea agreement. But he never said he was pursuing it either. It was Judge Biggs who suspended the Rule 11 hearing and sent everybody home. He didn't ask for that, but that happened because she wanted to hear from the original AOSA who drafted the indictment. In terms of, like, again, this is a criminal defendant facing serious charges who is justifiably confused and angry about these mistakes the government keeps making. I posit all that. But in a how-the-world-should-have-worked situation, at some point if the defendant no longer wants to plead guilty, it's probably incumbent upon and fairly easy for the defendant through counsel to say, just FYI, I know we are talking about a guilty plea. That's off. I'm going to trial. I would like to preserve my speeding trial rights. Like, in an ideal world, that's what would have happened, right? And if the government had said that's what led to the delay, we could credit that. We could believe it. We could say that's why they had the delay. They never said that was the reason there was a delay. That excuse was provided for them by the court. And this is because the government said we'll take responsibility for the 60 days. I mean, those two things don't seem entirely consistent. And, in fact, the district court didn't think they were inconsistent. It did say it's on the government. Like, they really messed this up. They also said there were some unusual circumstances at the time, partly because of this plea agreement that's hanging out there and then there's a superseding indictment and so there's confusion. And he said that might have confused the clerk's office. It might have just caused some confusion. And I see my time is running low. Can I give you just one more answer about how this confusion came about? So the judge actually, Judge Osteen, went back and did his own research about what happened in the clerk's office with regard to this. And if you've read the transcript, you've seen this, where he said that, you know, both the court and the government acknowledge it was the government's responsibility to get this thing on the calendar. At the end of February, a scheduling person from the U.S. Attorney's Office emailed the court and said, hey, we need to get this thing on the calendar for one reason or another, but we need to get it on the calendar. For two months, no response came back from the court, but neither did the government follow up. So there's just, I don't see any reasonable basis to conclude that the government thought it shouldn't be calendared, because they asked for it to be calendared, but then didn't follow up for two months when that didn't happen. Anyway, I will come back and speak with you on rebuttal. Thank you. Thank you, Ms. Hayes. We'll hear from Mr. Inman. May it please the Court, Stephen Inman for the United States. This Court should affirm the District Court because the District Court did exactly what 18 U.S.C. section 3162 required of it. That was to consider the three factors, among others, that are set forth in 3162 for whether this dismissal of this indictment should have happened with prejudice or without prejudice. And that is a decision that the Court made after a sound, extensive review of the record, in this case, after making substantial findings that are found at Joint Appendix 133-148 with regard to the Speedy Trial Act. And that is a decision that's left to the sound discretion of the District Court. Counsel, can I just preface this by saying you are very, very lucky the District Court didn't dismiss this indictment with prejudice because I think there are lots of District Court judges who would have dismissed this indictment with prejudice. I will be the first to admit, Your Honor, this is not the finest hour for the United States with regard to this indictment or with regard to the delay. And just as the District Court took it seriously, our office takes delays seriously. I do think that it's important to recall that the District Court hadn't just been confirmed yesterday when he heard this opinion. As the District Court says in his findings, at page, I believe it's 146 and 147, the judge essentially says, excuse me, 142, in my experience, 14 plus years as a District Judge and 20 years of practicing in this district beforehand, the parties have been in the past very cognizant of speedy trial responsibilities. This is not a slow docket and something like this happening is very unusual. In other words, the judge says, look, in my experience over almost 35 years in this district, dealing with the U.S. Attorney's Office, dealing with the Clerk's Office, dealing with the defense bar, everybody operates and moves cases judiciously and speedily. And so the court is making that assessment in terms of considering not only the facts and circumstances of this case, but also in determining whether looking at the impact of re-prosecution, it's important in deterring the government to dismiss the case with prejudice or without prejudice. And the court is saying... If there's reason to believe it's a systemic problem. What I'm sort of positing is whether that's a legally permissible consideration or not. Because it's certainly not one of the factors listed in the statute that you're supposed to consider. Well, Your Honor, I think that... Like first screw up is free? First really, really bad screw up is free because you haven't screwed up really, really bad before? No, Your Honor, I don't think that's it. I think the third factor, which is where the court made this analysis, is on the impact of a re-institution of the prosecution. How that would impact the administration of justice and the administration of the Speedy Trial Act. And so when the court is considering, hey, how much do I need to deter the government? Because that's one of the things that the Supreme Court says in Taylor is, look, if we dismiss every single indictment that goes past 70 days, that is going to deter for certain. Super deterrence. Super deterrence. But it would also nullify the first two factors that Congress has set forth in 3162, the seriousness of the offense and the facts and circumstances that led to the dismissal. And so the court has to balance all those. And the court did balance all those. And, of course, it found at page 133, the seriousness of the offense, the first factor, no one disputes. The defendant to this day doesn't dispute that this is a serious set of offenses. Obviously it's serious given the sentence he ultimately received. But it certainly is something that the court factored into its determination as it was required to do. And then the second, the lengthiest portion of the court's findings, found from pages 134 to roughly 142 or 143 of the joint appendix, on the second issue, the facts and circumstances. And the court highlights three issues with regards to the facts and circumstances, as this court's already noted. First is that the clerk messed up, essentially, in not setting this case down for arraignment. Second, and where the court spends the most time discussing this, is that the government screwed up in not keeping an eye on this case for a 60-day period. Well, the government screwed up, by my count, no fewer than three times. Is that right? Well, Your Honor, we certainly did not— Indictment one, mistake. Indictment two somehow fixes that mistake but introduces a new mistake, which is— I will say, of all the things in this case that is baffling to me, is that you screw up the indictment once, and in the course of fixing the indictment, you introduce a new mistake in the indictment. Well, I would say, Your Honor, in terms of— I just can't imagine—we all make mistakes. I've made plenty of mistakes. But, like, the mortification that must come after mistake one is, like, we need to make absolutely certain that indictment two does not have a mistake. God forbid it doesn't introduce a new mistake that wasn't in indictment one. How the heck does that happen? Inadvertence, Your Honor, I would say. And, again, I'm not here to— That's a very kind way of describing what strikes me as at least gross negligence and probably plausibly worse than gross negligence. Well, the one thing I would say to the court in response to that, because it is, again, not the government's finest hour with regard to the drafting and the care and review of the indictment in this case, and then the superseding and the second superseding before we finally got it right. But this is not something that inured to the prejudice of the defendant. And I know that, Your Honor. No, except that this individual who's thrust into the criminal justice system facing a very scary prospect of really bad things happening to them, who's told that he has all kinds of rules he has to follow, and if he breaks any of them, really bad things happen to him. And then he's told that the government screwed something up and then screwed something up again. I don't know. It seems quite plausible that a totally reasonable person, especially a layperson, would be extremely upset and confused by that. And that might adversely affect his relationship with his lawyer when his lawyer tells him, doing what they're supposed to do as an officer of the court, like, I get it, this sucks, and I'm sorry they screwed this up, but we can't do anything about it. And the defendant is frustrated when his lawyer tells him that. This all strikes me as totally plausible behavior. Well, Your Honor, what I can say with regard to what his lawyer told him is that his lawyer did discuss, and we know this from Jordan Appendix 56 through 58, when his first lawyer moved to withdraw, he told the court, and this is not contested in the record anywhere, Mr. Chamberlain, his first lawyer, told the court, look, we discussed, me and my client, me and Mr. Jennings, we discussed this discrepancy between the fentanyl and the heroin in Count 1 and Count 3. What did Mr. Chamberlain do on Mr. Jennings' behalf? Mr. Chamberlain negotiated a plea agreement to Count 4. And it's a remarkable plea agreement, and I suggest that it is an indication that the government acknowledged it screwed up in negotiating that plea deal and that Mr. Chamberlain took advantage of that because he negotiated a plea agreement to the only agreement, excuse me, the only county indictment that capped Mr. Jennings' exposure at 120 months. And that was what Count 4 did. When did you first come to recognize it had made one of the better terms to screw up or the mistake here? When was this brought to the government's attention? Your Honor, it was certainly brought at Mr. Jennings' initial appearance when he appeared before the master judge. And that had been the first time, and then once that occurs, what would be the course of conduct? I mean, I would think as a prosecutor, you look down and you see an indictment and it had something patently wrong in it. It just seems at that point, I mean, the cases for the government to prosecute something ought to be done. I mean, there are a lot of ways, and I mean, you do superseding indictments and the whole bit that goes with that. And I'm not so sure it's so benign that, you know, you can kind of, you sort of pattern this, well, this is, Judge Holstein had been there for 34 years and this is not the way it's done. Well, he says on J8-120, this looks like it's a problem, like this business of delay coming from having to correct indictments seems to be a problem. Certainly Judge Biggs alluded to it. I don't know what goes on in the Middle District. But I think that comes into play, and maybe it's sloppiness, maybe it's inadvertence, whatever term you want to use to play it down or play it up. But it's serious business. To a defendant, I mean, in a criminal court, that's, this is not some little, to substitute heroin for fentanyl is pretty serious stuff. It certainly changes the character of stuff. You didn't call fentanyl a particularly scheduled drug when it's not. That's pretty serious. I mean, that alters how long you're going to be in jail and also comes into play, how do you negotiate when you've got the wrong stuff? I mean, what were your considerations? And should that be a negotiation tactic? That is, I put heroin in there, and I tell you what, I'm going to cut you a break because there shouldn't be heroin in there. Should that be? Because then you're starting up here when you really should be starting here with the negotiation of a plea agreement. So, I mean, at the end of the day, there's something going on here. Your trial judges recognize it. The issue before us is whether Judge Osteen should have dismissed this with prejudice or without prejudice. What is our review of that? Your Honor, this court's review and the standard is abuse of discretion. And so what I understand and what I think the lesson from the Supreme Court in the Taylor case and this court's cases is this court is to look to see whether the district court considered the three factors that are set forth in 3162. And the problem that the Supreme Court identified in Taylor is that the district court didn't consider the three factors under 3162. And if this court is satisfied that the district court reviewed those three factors, made findings based on those factors, then it comes to an abuse of discretion standard. And again, that's not to say that this court on a de novo review couldn't look at the same record and say, as you indicated, Your Honor, that the issue with this is so grave and so concerning that I have to dismiss this with prejudice. So I assume, I was thinking about this, but I assume if the district court had dismissed with prejudice, the government could have appealed? I believe we could have appealed, Your Honor. Do you think you would have been likely to win on appeal? I'm sorry? Do you think you would have been likely to win that appeal? I do not think we would have been likely to have won on the appeal, Your Honor, because again, I think it's a decision that's entrusted to the sound discretion of the district court. And so just as we lost, I believe it was the Hardin case that my colleague across the aisle notes in her brief, that was a case where we appealed. And this court said, tough luck, government. So can I ask you about the two-month period? Now, I want to bracket for a moment your friend on the other side's argument that the district court sort of accepted an argument on behalf of the government the government hadn't actually made. But what exactly was the government doing during these two months between when he gets a second attorney and when he was arraigned? Why did that take two months to get this guy a new arraignment? Your Honor, I think it... What was the government doing? As the court identified, Your Honor, it was mere inadvertence. There was nothing in the record to suggest that the government was doing anything other than failing to recognize that this defendant had not been brought back before the court for an arraignment. They did nothing. For 60 days, Your Honor, we... Simple answer. We did nothing. We did nothing. Yeah, I think that's a good answer. Well, and it's... So now, like, remove the... Like, your friend on the other side said that the district judge said, like, maybe it was because of the plea agreement and maybe because the clerk's office was confused. Did the government argue, like, any of that before the district court? I think the government fell on its sword and said essentially that we didn't get this done over the 60-day period. And then it fell to the district court to say, as the district court did at Joint Appendix 141, I simply don't see anything in this case based on the record before me of any type of bad faith or intentional misconduct or delay on behalf of the government. What would that be? I guess I've been thinking about this. You know, I know the cases say bad faith. Like, what would it... Like, what would that be? I think if perhaps... It strikes me that almost all the times that people have speedy trial act violations, it's because... I mean, look, I have been a government lawyer before I had my current job. Like, people screw things up. But what would bad faith be as opposed to, like, I don't know, I screwed up and I didn't pay attention and I thought someone else was handling it. Like, I don't know what bad faith would even be in this context. I think certainly bad faith could be if we had sent e-mails that said, hey, let's throw this guy in a dark hole, see if we can tune him up, soften him up a little bit, maybe he'll be more receptive to our... We'll hold him as long as we possibly can. Yes. And here I think the reason that's not a plausible thing to think that the government thought is because this defendant had a plea agreement. And not only did he have a plea agreement, he had an immensely beneficial plea agreement to him. As the court knows from looking at the pre-sentence report and from the trial, the defendant admitted his conduct. He didn't just admit the fentanyl that he possessed at his house that day. He admitted that he had been selling heroin for four months and re-upping two ounces every two to three days. He admitted that he bought the gun that was found at his house near those drugs. And so this is a defendant... He admitted he was selling heroin for four months? He admitted he was selling heroin. And I'll say this, in terms of the fentanyl-heroin discrepancy, even the defendant was confused about fentanyl and heroin. And so if this court looks at those portions of the pre-sentence report, Joint Appendix 935 and 936, the defendant tells the police when they come to serve the search warrant, he says that he had a personal use bag of heroin in his pocket. What he identified as heroin turned out to be fentanyl when the lab tested it. The special agent, the expert from the Drug Enforcement Administration, Steven Razek, who testified at trial in this case, indicated that basically heroin and fentanyl are essentially indistinguishable until you have a laboratory test. All that to say that there's a reason that people are dying in this country from fentanyl overdoses, because a lot of times they think they're buying heroin. And a lot of times the people selling it think they're selling heroin. But in essence, what was found here was fentanyl at the time here. There wasn't any heroin involved in the process. And clearly the inclusion of heroin in the indictment was, I guess, a mistake. That was a massive error. I mean, that's what we're dealing with here. I mean, yeah, we can talk about how bad heroin is in fentanyl, but that's not our issue today. The issue here has to do with the speedy trial, the delay that occurred during this period of time. And, you know, I think at the end of the day, however this case comes back, the facts don't reflect very well on the Middle District in terms of how things are going. And that pains me greatly, being a North Carolinian myself, being also you've got three outstanding trial judges here, and they picked up on this. I mean, Judge Osteen picked up on J120 and certainly Judge Biggs. I'm sure Judge Froh picked up on this. And they're just trying to do the best job they can do. And this is not very hard to do. I mean, this is the simpler thing to do. And that's what you call the right thing, to treat even hardened criminals with respect of what the criminal system allows them to do. You've got all the cards in there. I mean, just do the job. And it puts you to have to come up and argue. I'm not even sure you had this case below. You might have. I don't know. But it puts you in a position to come up here and argue with us. You write an opinion. That does not look good on paper. That thing stays in the book forever and ever. So I'm pretty confident somebody's having a discussion down there. We won't see this type of case again, I hope, not from any of the states and for certain anywhere else. But we won't see this kind of thing. I would certainly hope that's true, Your Honor. And as the criminal chief for the United States Attorney's Office in the Middle District of North Carolina, I certainly take this case very seriously. I certainly don't want to see this. I can tell you, probably it would be harder now for you to argue this case. If we see this stuff again, I mean, this is the pattern and stuff. It's like, wow, it's almost like, as Judge Hyden alluded to, you've got a mistake. And lo and behold, you make another mistake that's not even on the first one. A new one comes on the second one. He says, who's doing this stuff? And it's pretty straightforward stuff. I mean, you don't have to dream up an indictment. There are a lot of ones out there. You've got a bunch of these things out there. Someone can sit and copy them and do it right. Anyway, judges? Just a quick question on a separate question. So your colleague asked that we consider her client's post-date briefs, given that he feels strongly he would prefer to represent himself. And I think we've already said we're not going to do that. But in light of his wishes, your colleague thinks maybe we should take a look. And I guess I'm just wondering if you would have any objection to that. Or maybe you'd want to file something supplemental. Your Honor, I think if the Court wants to consider his briefs, we would ask to be, maybe have the opportunity to respond to those. I think that, again, in the Court of Appeals, different than obviously in the District Court, where parties have the opportunity to represent themselves, here this Court depends on learning counsel to be able to advise the Court on issues that those lawyers believe merit review. And, again, I think my colleague across the aisle has certainly hit upon a good issue. Obviously this Court is engaged with this. And, again, we take it seriously. But I think that given the fact that there have been an ample number of issues that have been raised in the briefs in this case, I don't believe that the pro se briefs ought to be considered. But if they are, I would ask that we be allowed to have an opportunity to respond to those. But if there are no other questions from the Court, I would ask that the Court affirm the District Court's findings. Thank you. Thank you. Ms. Denman. Ms. Hayes, you have your minutes in the bubble. Thank you, Your Honor. I have a few things I want to address. I just very quickly want to address the issue of Mr. Jennings' informal briefs. And I want to note specifically that the Court twice gave him permission to file those briefs. He didn't just supplement after I filed a brief. The Court twice gave him permission. You got something in that brief that's better than the brief you sent us? I raised the issues I thought were the best ones, Your Honor. Nevertheless. What do you think in his brief is going to add some flavor that's different than the wonderful brief you sent us? I frankly think it's a matter of showing respect to Mr. Jennings and forced counsel on him. I think it was a good thing to force me on him. Do you think there's anything legal in that brief there that has any great so much merit that it would influence this Court? You're probably going to say no because that would tell you you should have put it in yours, right? So that's not true. I think I picked the best issues to present to this Court, Your Honor. But I don't think it would be a great hardship for the Court to read his briefs. That's fair. Do you, I guess though, fair enough. Do you take issue with the government's suggestion that if we're going to consider arguments that are in only a pro se brief, the government should probably have an opportunity to respond to those? Yes, of course they should have an opportunity. And they actually had an opportunity. He filed informal briefs. They sat on their hands and didn't respond. Well, except counterargument. So there you go. We will accept our practices with respect to what happens in district courts sometimes. We have said repeatedly there is no such thing as hybrid counsel in the Fourth Circuit. The government could reasonably understand our practice to say you're not required to respond to things that are only in a pro se brief because there's no such thing as hybrid representation. They're not required to, but they're not forbidden. And also they were pending before we appointed counsel. It was in a break between appointed counsel. He was appointed counsel. Counsel withdrew. I'm the third or fourth appellate. When he filed, I'm sorry, when your client, Mr. Jennings, filed his informal briefs with us, it took a minute before he said we want to appoint counsel for argument. Exactly, Your Honor. So those briefs were sitting there and the government couldn't have responded to them. Exactly, Your Honor. I want to make just a few more points very quickly. Judge Harris, you had asked me a question about if Judge Osteen actually found Mr. Jennings to be unreasonable. At page 146 in the joint appendix, he says defendants' unreasonable and unfounded positions expressed in his letters with respect to defects in the prosecutorial process, i.e., defects in the indictment, leave me little doubt that those positions contributed to the delay. So, yes, he did specifically say that he was unreasonable and his positions unfounded. Next, I'd like to say that this is not an ordinary case where the government was just inadvertent for a little bit. This fits within the definition of a truly neglectful attitude, which the Supreme Court and Taylor said could be a basis for a with prejudice dismissal, and which in Hardin the court affirmed a with prejudice dismissal on the basis that there had been a truly neglectful attitude, even though there was no bad faith and no intentional delay. So here, what's the truly neglectful, other than the length, what is the truly neglectful attitude other than the sheer amount of time? It starts with the defect in drafting the First Amendment. It was sloppy. It's neglectful. You don't have to have heroin in there when there's no heroin involved. That's not a defect related to the Speedy Trial Act. That's screwing up drafting an indictment. No, but it's still a matter of having neglectful behavior, truly neglectful behavior. He did that. The magistrate judge recognized it. They didn't do anything to correct it. They only corrected it after the district judge said, I need you to come in here and explain to me how something like this could have happened. Rather than embarrass themselves, go in and give that explanation. They superseded the indictment and introduced a new error in the superseding indictment, which Mr. Jennings, he may not have a great deal of education, but he is a detail-oriented man and he's involved in his representation. And he was facing a lot of time. He noticed that. It bothered him. It created more angst on his part. That's non-trial prejudice that occurred to Mr. Jennings. And then only after all of that happened did the government just sit back for two months and not do anything while the case languished. So that's a pattern within this case. And it's truly neglectful attitude on the part of the government where, as you mentioned, you mess up his case once, don't you think you'd be more careful? No. The government kept making mistakes and these things fell on Mr. Jennings. And I would mention the dismissal of prejudice, it really didn't have much of an effect at all on the government. Yes, you go back to the grand jury for a little bit of time. You present the same case again. You come back with the same indictment. But Mr. Jennings, by the time May rolled around, may I just have a couple, one more minute, Your Honor? Please proceed. By the time the May 4th rolled around and the judge had found that there were more than 90 days of non-excludable time had passed, Mr. Jennings was entitled to be released pending trial. There's a statute that says that you can't detain someone for more than 90 days pre-trial, taking into consideration excludable days. And they're entitled to go home. But instead of going home and awaiting trial, no, the government had the opportunity to just stop it and start it over and start the speedy trial clock all over again. Mr. Jennings suffered severe non-trial prejudice on that basis and the government suffered very, very little. Thank you, Your Honors.
judges: James Andrew Wynn, Pamela A. Harris, Toby J. Heytens